UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ALFRED MORIN,

                Plaintiff,

        v.

WILLIAM LYVER, in his official capacity as
Northborough Chief of Police,

                Defendant,

COMMONWEALTH OF MASSACHUSETTS,

                Intervenor-Defendant.

CIVIL ACTION NO.
4:18-cv-40121

**MEMORANDUM OF THE COMMONWEALTH OF MASSACHUSETTS
IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

MAURA HEALEY
ATTORNEY GENERAL

Julia Kobick, BBO #680194
Assistant Attorney General
Office of the Attorney General
Government Bureau
One Ashburton Place, 20th Floor
Boston, Massachusetts 02108
(617) 963-2559

Date: June 12, 2019

# TABLE OF CONTENTS

Table of Authorities ............................................................................................... ii

Introduction ............................................................................................................1

Statutory Background ............................................................................................1

Factual Background ................................................................................................5

Argument ...............................................................................................................8

I.      Massachusetts May Categorically Disqualify Persons Like Morin with Misdemeanor
        Convictions from Firearms Possession. ................................................................9

II.     Even if This Court Assumes That Sections 131(d)(ii)(D) and 131A Implicate the
        Second Amendment, the Statutes Easily Withstand Constitutional Scrutiny. ...................11

        A.      This Court Should Review Sections 131(d)(ii)(D) and 131A Under, At Most,
                Intermediate Scrutiny. ..........................................................................12

        B.      Sections 131(d)(ii)(D) and 131A Must Be Upheld Under Intermediate
                Scrutiny Because Disqualifying Persons Convicted of Firearms Offenses Is
                Substantially Related to the Commonwealth's Important Interests in
                Promoting Public Safety and Preventing Crime. ..................................................13

III.    Morin's Personal Circumstances Are Irrelevant to His Second Amendment Claim,
        But Even If This Court Considers Them, His Claim is Foreclosed by *Hightower* ............16

Conclusion ...........................................................................................................21

# TABLE OF AUTHORITIES

**Cases**

*Bsharah v. United States*,
    646 A.2d 993 (D.C. 1994) ...............................................................................16

*Chardin v. Police Comm'r of Boston*,
    989 N.E.2d 392 (Mass. 2013) ......................................................................2, 3

*Chief of Police of the City of Worcester v. Holden*,
    26 N.E.3d 715 (Mass. 2015) ...................................................................1, 3, 13

*Clark v. Jeter*,
    486 U.S. 456 (1988)........................................................................................13

*Commonwealth v. Lopez*,
    745 N.E.2d 961 (Mass. 2001) .................................................................. 16-17

*Commonwealth v. Powell*,
    946 N.E.2d 114 (Mass. 2011) ...................................................................... 3-4

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)...........................................................................8, 12, 14

*Dupont v. Chief of Police of Pepperell*,
    786 N.E.2d 396 (Mass. App. Ct. 2003) ........................................................13

*Florida Bar v. Went for It, Inc.*,
    515 U.S. 618 (1995).......................................................................................13

*Friedman v. Highland Park, Illinois*,
    784 F.3d 406 (7th Cir. 2015) ...........................................................................9

*Gould v. Morgan*,
    907 F.3d 659 (1st Cir. 2018).......................................................9, 11, 12, 13

*Heller v. District of Columbia*,
    801 F.3d 264 (D.C. Cir. 2015) ......................................................................19

*Hightower v. City of Boston*,
    693 F.3d 61 (1st Cir. 2012)............................................ 2, 7, 11, 12, 17, 19-20

*MacNutt v. Police Comm'r of Boston*,
    572 N.E.2d 577 (Mass. App. Ct. 1991) ..........................................................2

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) ..........................................................................................8

*McMillen v. United States*,
    407 A.2d 603 (D.C. 1979) .............................................................................16

*Morin v. Leahy*,
    862 F.3d 123 (1st Cir. 2017) ............................................................................7

*Morin v. Leahy*,
    189 F. Supp. 3d 226 (D. Mass. 2016) ............................................. 6, 7, 18-19

*Powell v. Tompkins*,
    783 F.3d 332 (1st Cir. 2015) .........................................................................2, 8

*Ruggiero v. Police Comm'r of Boston*,
    464 N.E.2d 104 (Mass. App. Ct. 1984) ...................................................... 1-2

*Schrader v. Holder*,
    704 F.3d 980 (D.C. Cir. 2013) ................................................................12, 13

*United States v. Armstrong*,
    706 F.3d 1 (1st Cir. 2013) ........................................................................10, 16

*United States v. Booker*,
    644 F.3d 12 (1st Cir. 2011) ............................................. 8, 9, 11, 12-13, 17

*United States v. Carter*,
    752 F.3d 8 (1st Cir. 2014) ........................................................................10, 16

*United States v. Chovan*,
    735 F.3d 1127 (9th Cir. 2013) .......................................................................10

*United States v. Pruess*,
    703 F.3d 242 (4th Cir. 2012) .........................................................................10

*United States v. Rozier*,
    598 F.3d 768 (11th Cir. 2010) .......................................................................10

*United States v. Scroggins*,
    599 F.3d 433 (5th Cir. 2010) .........................................................................10

*United States v. Skoien*,
    614 F.3d 638 (7th Cir. 2010) (en banc) .....................................................9, 10

*United States v. Torres–Rosario,*
    658 F.3d 110 (1st Cir. 2011) ................................................................10, 17

*United States v. Vongxay,*
    594 F.3d 1111 (9th Cir. 2010) ......................................................................10

*United States v. White,*
    593 F.3d 1199 (11th Cir. 2010) ...................................................................10

*Worman v. Healey,*
    922 F.3d 26 (1st Cir. 2019) ..........................................................................11

## Statutes and Municipal Ordinances

18 U.S.C. § 922(g)(1) ..........................................................................................10

18 U.S.C. § 922(g)(9) ..........................................................................................10

18 U.S.C. § 930(a) ...............................................................................................19

18 U.S.C. § 930(e)(1) ...........................................................................................19

Conn. Gen. Stat. § 29–28 .....................................................................................18

Conn. Gen. Stat. § 29–35 .....................................................................................18

Conn. Gen. Stat. § 53–202g .................................................................................14

D.C. Code § 6–2376 (2004) ...................................................................................6

D.C. Code § 7–2502.01 ..........................................................................................6

D.C. Code § 7–2507.06 ..........................................................................................6

D.C. Code § 22–1803 ..............................................................................................6

D.C. Code § 22–3204(a)(1) (2004) .........................................................................6

D.C. Code § 22–4504(a)(1) .....................................................................................6

G.L. c. 140, § 121 ...................................................................................................2

G.L. c. 140, § 129 .................................................................................................19

G.L. c. 140, § 129B .................................................................................................3

G.L. c. 140, § 129B(1) ..................................................................................................4

G.L. c. 140, § 129B(1½)(a) ..........................................................................................4

G.L. c. 140, § 129B(1½)(b) ..........................................................................................4

G.L. c. 140, § 129B(1½)(c) ..........................................................................................5

G.L. c. 140, § 129B(4) ..................................................................................................4

G.L. c. 140, § 129B(9) ..................................................................................................4

G.L. c. 140, § 131 ......................................................................................................2, 4

G.L. c. 140, § 131(a) ..................................................................................................2, 3

G.L. c. 140, § 131(b) ..................................................................................................2, 3

G.L. c. 140, § 131(d) ................................................................................2, 3, 13, 17

G.L. c. 140, § 131(d)(i)(D) ............................................................................................3

G.L. c. 140, § 131(d)(ii)(D) ................................................................................ *passim*

G.L. c. 140, § 131(f) ............................................................................................... 3, 4-5

G.L. c. 140, § 131(h) ..................................................................................................19

G.L. c. 140, § 131(i) ......................................................................................................4

G.L. c. 140, § 131A ............................................................................................. *passim*

G.L. c. 140, § 131C(a) ................................................................................................14

G.L. c. 140, § 131C(b) ................................................................................................14

Ky. Rev. Stat. § 244.125 ............................................................................................14

Mass. St. 2014, c. 284 § 46 ..........................................................................................2

Mass. St. 2014, c. 284 § 47 ..........................................................................................2

Mass. St. 2014, c. 284 § 101 ........................................................................................2

Mass. St. 2014, c. 284 § 112 ........................................................................................2

Md. Code, Crim. § 4–203(a) .............................................................................18

Md. Code, Public Safety § 5–303 ....................................................................18

Mich. Code § 28.425f ......................................................................................14

Minn. Stat. § 624.7162.....................................................................................14

N.J. Stat. Ann. § 2C:39–5(b)............................................................................18

N.J. Stat. Ann. § 2C:58–4 ................................................................................18

N.Y. Penal Law, § 265.01 ................................................................................19

N.C. Gen. Stat. § 14–415.21 ............................................................................14

Wash. Rev. Code § 9.41.050.............................................................................14

**Rules and Regulations**

Fed. R. Civ. P. 56(c)(1)(A) ..............................................................................20

**Miscellaneous**

1997 N.Y. Op. Att'y Gen. 14 (1997) ................................................................19

Br. of Appellant, *Hightower v. City of Boston*, No. 11–2281,
    2012 WL 435288 (1st Cir. Feb. 7, 2012) ........................................................20

Bureau of Justice Statistics, U.S. Dep't of Justice, Fact Sheet: *Profile of
    Nonviolent Offenders Exiting State Prisons* (Oct. 2004) ..................................15

Bureau of Justice Statistics, U.S. Dep't of Justice, *Recidivism of Prisoners
    Released in 30 States in 2005: Patterns from 2005 to 2010* (Apr.
    2014) ...................................................................................................... 15-16

Jose Pagliery, *Gun Form Liars May Go on to Commit Gun Crimes,
    Internal ATF Research Suggests*, CNN Investigates (Dec. 21,
    2018) ........................................................................................................20

Reply Br. of Appellant, *Hightower v. City of Boston*, No. 11–2281,
    2012 WL 1572549 (1st Cir. May 1, 2012) .......................................................17

U.S. Govt. Accountability Office, STATES' LAWS AND REQUIREMENTS FOR
    CONCEALED CARRY PERMITS VARY ACROSS THE NATION (July
    2012) ...................................................................................................................18

Garen J. Wintemute et al., *Prior Misdemeanor Convictions as a Risk
    Factor for Later Violent and Firearm-Related Criminal Activity
    Among Authorized Purchasers of Handguns*, 280 J. AM. MED.
    ASS'N 2083 (1998) ...................................................................................... 14-15

Mona A. Wright et al., *Felonious or Violent Criminal Activity That
    Prohibits Gun Ownership Among Prior Purchasers of Handguns:
    Incidence and Risk Factors*, 69 J. TRAUMA 948 (2010) ....................................15

## INTRODUCTION

Massachusetts law disqualifies individuals convicted of "a violation of any law regulating the use, possession, ownership, transfer, purchase, sale, lease, rental, receipt or transportation of weapons or ammunition for which a term of imprisonment may be imposed" from obtaining a license to carry firearms. G.L. c. 140, § 131(d)(ii)(D). The plaintiff in this case, Dr. Alfred Morin, was convicted in 2004 in the District of Columbia of possession of an unregistered firearm and attempted carrying of a pistol without a license, after he sought to enter a federal government building with a loaded pistol. The Chief of the Northborough Police subsequently denied Morin's applications to renew his license to carry firearms pursuant to G.L. c. 140, § 131(d)(ii)(D) and to obtain a permit to purchase firearms under G.L. c. 140, § 131A, because Morin's convictions were for violations of laws regulating the possession of weapons, and they authorized terms of imprisonment.

In this lawsuit, Morin contends that G.L. c. 140, §§ 131(d)(ii)(D) and 131A violate the Second Amendment, as applied to him, by making him ineligible for a license to carry and a permit to purchase. That claim fails. Even if Morin's claim implicated the Second Amendment, Sections 131(d)(ii)(D) and 131A easily survive constitutional scrutiny because they are substantially related to the Commonwealth's important interests in preventing crime and promoting public safety. This Court should accordingly grant judgment in favor of the Commonwealth and deny Morin's motion for summary judgment.

## STATUTORY BACKGROUND

The purpose of firearms control legislation in Massachusetts "is to 'limit access to deadly weapons by irresponsible persons.'" *Chief of Police of the City of Worcester v. Holden*, 26 N.E.3d 715, 723 (Mass. 2015) (quoting *Ruggiero v. Police Comm'r of Boston*, 464 N.E.2d 104,

106 (Mass. App. Ct. 1984)). "Among the principal measures adopted in furtherance of that goal are the provisions of G.L. c. 140, § 131, governing the licensing of persons to carry firearms." *MacNutt v. Police Comm'r of Boston*, 572 N.E.2d 577, 579 (Mass. App. Ct. 1991). Thus, to lawfully carry a firearm in Massachusetts, a person generally must obtain a license to carry firearms under G.L. c. 140, § 131. *See Hightower v. City of Boston*, 693 F.3d 61, 65–67 (1st Cir. 2012) (describing statutory framework); *Chardin v. Police Comm'r of Boston*, 989 N.E.2d 392, 395 (Mass. 2013) (same). Such licenses are issued by a "licensing authority," defined as either "the chief of police or the board or officer having control of the police in a city or town," G.L. c. 140, § 121, or the colonel of the State police, *id.* § 131(d).

Holders of licenses to carry[1] may possess and carry large-capacity[2] and non-large-capacity "firearms," "rifles," or "shotguns," either openly or in a concealed manner, in their homes or in public. *Id.* § 131.[3] A person seeking a license to carry must file an application with a licensing authority, which in turn must determine whether the applicant is disqualified by statute

---

[1] Under current law, certain licenses to carry may be designated a "Class A" or a "Class B" license. *See* G.L. c. 140, § 131(a)–(b). In 2014, however, the Legislature enacted "An act relative to the reduction of gun violence," which, effective January 1, 2021, revised G.L. c. 140, § 131(d) to provide for only one type of license to carry, rather than distinct Class A and Class B licenses. *See* Mass. St. 2014, c. 284 §§ 46, 47, 112; *Powell v. Tompkins*, 783 F.3d 332, 338 n.2 (1st Cir. 2015) ("[T]he new law will eliminate the category of Class B license in order to create a unitary license to carry."). Licenses to carry that have been issued or renewed since August 11, 2014, the day the Act went into effect, have not been designated "Class A" or "Class B," but rather just a "license to carry." *See* Mass. St. 2014, c. 284 § 101 (providing that, as of the effective date of the 2014 law, licensing authorities may not "issue, renew or accept [an] application for a Class B license to carry pursuant to sections 131 or 131F of said chapter 140").

[2] A "large capacity weapon" is, in general, "any firearm, rifle or shotgun" that is "semiautomatic with a fixed large capacity feeding device…or capable of accepting…any detachable large capacity feeding device." G.L. c. 140, § 121.

[3] A "firearm" is a "pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged" and with a barrel less than 16 inches. G.L. c. 140, § 121. A "rifle" is "a weapon having a rifled bore with a barrel length equal to or greater than 16 inches." *Id.* A "shotgun" is "a weapon having a smooth bore with a barrel length equal to or greater than 18 inches with an overall length equal to or greater than 26 inches." *Id.*

from obtaining the license. *See id.* § 131(d); *Chardin*, 989 N.E.2d at 395. Certain categories of applicants are ineligible for a license to carry, including, as relevant here, applicants who have been convicted, "in a court of the Commonwealth" or "in any other state or federal jurisdiction," of "a violation of any law regulating the use, possession, ownership, transfer, purchase, sale, lease, rental, receipt or transportation of weapons or ammunition for which a term of imprisonment may be imposed." G.L. c. 140, §§ 131(d)(i)(D), (d)(ii)(D).[4]

If an applicant is not disqualified, the licensing authority may issue a license to carry so long as the applicant is not "unsuitable" to be licensed. *Id.* § 131(d). Suitability review "allows licensing authorities to keep firearms out of the hands of persons who are not categorically disqualified, … but who nevertheless pose a palpable risk that they would not use a firearm responsibly if allowed to carry in public." *Holden*, 26 N.E.3d at 724. The licensing authority may issue the license to carry subject to restrictions. *Id.* §§ 131(a), (b). Applicants aggrieved by the denial of a license to carry are entitled to judicial review in state court. *Id.* §§ 131(d), (f).

A licensing authority may separately issue firearms identification ("FID") cards, which are more limited than the license to carry. *See* G.L. c. 140, § 129B. An FID card allows the holder to possess shotguns and rifles, and to "possess a firearm within the holder's residence or

---

[4] Other categories of applicants who are ineligible for a license to carry include: (1) persons convicted of felonies; misdemeanors punishable by more than two years' imprisonment; certain violent crimes; violations of laws regulating controlled substances; or misdemeanor crimes of domestic violence; (2) persons who have been committed to a hospital or institution for mental illness or for substance or alcohol abuse disorder, unless, in certain circumstances, a court has granted the person's petition for relief or the person's physician attests that she is no longer disabled by the illness; (3) persons who are subject to an order from the probate court appointing a guardian on their behalf due to mental incapacitation, unless a court has granted the person's petition for relief from that order; (4) persons less than 21 years old; (5) non-citizens who do not maintain lawful permanent residency; (6) persons currently the subject of an abuse prevention restraining order; (7) persons subject to an outstanding arrest warrant; (8) persons who have been dishonorably discharged from the United States armed forces; (9) fugitives from justice; and (10) persons who have renounced their United States citizenship. G.L. c. 140, § 131(d)(i)–(x).

3

place of business, but not to carry it to or in any other place." *Commonwealth v. Powell*, 946 N.E.2d 114, 128 (2011). To obtain an FID card, a person must submit an application to a licensing authority, which determines whether the applicant is disqualified based on a prior conviction or another factor enumerated in the statute. G.L. c. 140, § 129B(1). The categories of persons disqualified from obtaining an FID card generally align with the categories of persons disqualified from obtaining a license to carry. *See id.* Although the statute does not require a separate suitability determination prior to issuance of an FID card, a licensing authority that seeks to deny an FID on that ground may file a petition in district court for a determination that an applicant is unsuitable. *Id.* § 129B(1½)(a)–(b).

Licensing authorities may also issue "permits to purchase" to individuals with FID cards under G.L. c. 140, § 131A. An FID card holder with a permit to purchase can "purchase, rent or lease a firearm if it appears that such purchase, rental or lease is for a proper purpose." *Id.* To obtain a permit to purchase, an applicant must possess all the same qualifications for obtaining a license to carry under G.L. c. 140, § 131. *See* G.L. c. 140, § 131A ("A licensing authority under [§ 131], upon the application of a person qualified to be granted a license thereunder by such authority, may grant to such a person…a permit to purchase."). Thus, anyone who is categorically prohibited from obtaining a license to carry under § 131 will be unable to obtain a permit to purchase under § 131A.

Unless revoked or suspended, licenses to carry and FID cards must be renewed every six years. *Id.* §§ 129B(9); 131(i). Licenses to carry and FID cards must "be revoked or suspended by the licensing authority…upon the occurrence of any event that would have disqualified the holder from being issued such license or from having such license renewed." *Id.* §§ 129B(4);

131(f). A person's license to carry or FID card may also be revoked "if it appears that the holder is no longer a suitable person to possess such license." *Id.* § 131(f); *see also id.* § 129B(1½)(c).

## FACTUAL BACKGROUND

Morin was issued a license to carry in Massachusetts in 1985. Deft's Ex. A, ¶ 2. He held that license until it expired in February 2008. Deft's Ex. B, at 1. On February 17, 2008, Morin applied to renew his Class A license with the Northborough Police Department. *Id.* at 3. The renewal application form asked, among other things, whether Morin had, "in any state or federal jurisdiction," been convicted of "a violation of any law regulating the use, possession, ownership, sale, transfer, rental, receipt or transportation of weapons for which a term of imprisonment may be imposed." *Id.* at 2. Morin falsely answered "no." *Id.*

Following standard practice, the Northborough Police Department then ran a fingerprint check on Morin. *See* Deft's Ex. C. That fingerprint check revealed that Morin had in fact been convicted in the District of Columbia in October 2004 for violating two laws regulating the possession of weapons. *Id.* Morin had driven from his home in Massachusetts to Washington, D.C. with a Colt Pocket Lite pistol, loaded with five rounds of ammunition. Deft's Ex. A, ¶¶ 5– 6. At the time of his trip, Morin was only licensed to carry a firearm in Massachusetts, not in any of the states he passed through on the way to Washington D.C. *Id.* ¶¶ 2–3. Once in Washington, Morin brought his pistol to the American Museum of Natural History, part of the federal Smithsonian Institution. Deft's Ex. D, at 4. Upon noticing metal detectors at the entrance of the building, Morin asked a security guard to check his loaded pistol. *Id.*; Deft's Ex. A, ¶ 7. The security guard notified the police, and Morin was arrested and charged with carrying a pistol without a license ("CPWL"), possession of unregistered ammunition, and possession of an unregistered firearm. Deft's Ex. A, ¶ 8.

Morin pleaded guilty to attempted CPWL, in violation of D.C. Code §§ 22–3204(a)(1) (2004)[5] and 22–1803 (2004), and possession of an unregistered firearm, in violation of D.C. Code § 6–2376 (2004).[6] Deft's Ex. E. The CPWL count carried a maximum sentence of five years in prison, *see* D.C. Code § 22–3204(a)(1) (2004), but because Morin had pleaded guilty to an attempt, his maximum sentence was reduced to 180 days pursuant to D.C. Code § 22–1803. The maximum sentence for the possession of an unregistered firearm count was 1 year. *See* D.C. Code § 6–2376 (2004). Morin was sentenced to 60 days, suspended, in prison on each count, to run concurrently, as well as three months' supervised probation and 20 hours of community service. Deft's Ex. E. Because of these convictions, which qualified as "violation[s] of…law[s] regulating the…possession…of weapons or ammunition for which a term of imprisonment may be imposed" under G.L. c. 140, § 131(d)(ii)(D), the Chief of the Northborough Police Department denied Morin's application to renew his license to carry firearms. Deft's Ex. F.

In 2015, Morin submitted a new application for a license to carry firearms. *See* Deft's Ex. D. This time, when asked if he had ever been convicted of a "violation of…a law regulating the…possession…of weapons or ammunition for which a term of imprisonment may be imposed," Morin answered yes. *Id.* at 2. Because of Morin's prior convictions, the Northborough Police Chief again denied his application for a license to carry. Deft's Ex. G.

Morin then filed a lawsuit in this Court claiming that the denial of his license-to-carry application pursuant to Section 131(d)(ii)(D) violated his rights under the Second Amendment. *See Morin v. Leahy*, 189 F. Supp. 3d 226 (D. Mass. 2016). In ruling on the parties' cross-motions for summary judgment, this Court noted that Morin had only applied for the "the least restrictive

---

[5] This provision has been renumbered and is now codified at D.C. Code § 22–4504(a)(1).

[6] This provision has been renumbered and is now codified at D.C. Code §§ 7–2502.01 and 7–2507.06.

license available in Massachusetts, allowing him to carry concealed firearms in public." *Id.* at 234. Morin had not applied for an FID card, which would have allowed him to possess a firearm in his home. *See id.* at 231. Thus, it was "not necessary to determine whether a complete categorical prohibition on the arms rights of individuals who have been convicted of certain weapons-related misdemeanors is constitutional, because that [wa]s not what [wa]s being challenged in th[e] case." *Id.* at 234. This Court held Section 131(d)(ii)(D) was constitutional as applied to Morin's request to carry firearms in public, because the law did not implicate the "'core' Second Amendment right" and it "serve[d] the important purpose of preventing potentially dangerous individuals from carrying concealed firearms." *Id.* at 236 (citing *Hightower*, 693 F.3d at 72, 74, 76).

The First Circuit affirmed under a similar rationale. *See Morin v. Leahy*, 862 F.3d 123, 126–27 (1st Cir. 2017). It noted that, with an FID card and a permit to purchase, Morin could obtain a firearm for self-defense in his home, but he had not applied for those licenses. *See id.* at 127. Because Morin had asserted only that the Commonwealth's statutory scheme violated his purported right to possess a firearm for self-defense in his home, but he had not applied for permits that would have enabled him to exercise that right, the court concluded that the denial of his license-to-carry application did not violate the Second Amendment as applied to him. *See id.*

In February 2018, Morin applied for an FID card and a permit to purchase from the Northborough Police Department. Although the Chief of the Northborough Police approved Morin's application for an FID card, *see* Deft's Ex. A, ¶ 2, he denied Morin's application for a permit to purchase because Morin's "prior convictions for firearms related offenses in Washington DC constitute a statutory disqualifier under MGL Chapter 140, Section 131(d)(ii)(D) and MGL Chapter 140, Section 131A," *see* Decl. of Stephen Foley, Exhibit B

(ECF No. 22-2). Morin thereafter filed this lawsuit, claiming that the denials of his license-to-carry application pursuant to G.L. c. 140, § 131(d)(ii)(D) and permit-to-purchase application pursuant to G.L. c. 140, § 131A violate the Second Amendment as applied to him. In October 2018, this Court allowed the Commonwealth's motion to intervene to defend the constitutionality of those statutes. *See* ECF No. 12.

## ARGUMENT

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Supreme Court held that the Second Amendment secures a limited right, incorporated against the States, for law-abiding, responsible citizens to possess a firearm in the home for self-defense. *See Powell v. Tompkins*, 783 F.3d 332, 347 (1st Cir. 2015). The Court emphasized, however, that the right "secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. Many laws restricting the possession of firearms, the Court explained, are "presumptively lawful." *Id.* at 626–27 & n.26. Those presumptively lawful measures include, but are not limited to, "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms," as well as laws that regulate the carrying of concealed weapons. *Id.*

From this precedent, the First Circuit has drawn two key conclusions about a state's prerogative to restrict firearms possession. First, categorical restrictions on the possession of firearms by certain individuals are constitutionally permissible, and the government need not determine, on a case-by-case basis, whether a particular individual should be exempted from a categorical disqualification. *See United States v. Booker*, 644 F.3d 12, 23 (1st Cir. 2011); *infra*, at 9–11. Second, the core right of the Second Amendment is, as *Heller* said, the right of law-

abiding, responsible citizens to use arms in defense of hearth and home. Laws peripheral to that core right are subject to less scrutiny than laws that directly burden that core right. *See Gould v. Morgan*, 907 F.3d 659, 672 (1st Cir. 2018), *petn. for cert. filed* (No. 18–1272); *infra*, at 12.

Those principles require the rejection of Morin's Second Amendment claim. Sections 131(d)(ii)(D) and 131A permissibly restrict a category of individuals—as applied here, persons with nonviolent weapons-related misdemeanor convictions for which a term of imprisonment may have been imposed—from possessing firearms. Because the statutes affect only individuals who, by definition, are neither law-abiding citizens nor responsible firearms owners, the statutes are presumptively lawful and far removed from the core protections of the Second Amendment. Thus, even assuming Morin's claim implicates the Second Amendment, this Court should review the laws under, at most, intermediate scrutiny. And under that standard of review, Sections 131(d)(ii)(D) and 131A must be upheld, because there is a substantial relationship—supported by empirical research and plain common sense—between the restriction on firearms possession and the Commonwealth's goals of preventing crime and promoting public safety.

**I.**    **Massachusetts May Categorically Disqualify Persons Like Morin with Misdemeanor Convictions from Firearms Possession.**

In *United States v. Booker*, the First Circuit held that "the Second Amendment permits categorical regulation of gun possession by classes of persons." 644 F.3d at 23; *see also id.* ("'statutory prohibitions on the possession of weapons by some persons are proper'" (quoting *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc)); *Friedman v. Highland Park*, 784 F.3d 406, 410 (7th Cir. 2015) ("at least some categorical limits…are proper"). Restrictions on the right to possess a firearm need not, therefore, "be imposed only on an individualized, case-by-case basis." *Booker*, 644 F.3d at 23.

Applying this principle, the First Circuit has rejected a Second Amendment challenge to

18 U.S.C. § 922(g)(1), which permanently prohibits all convicted felons from possessing firearms. *See United States v. Torres–Rosario*, 658 F.3d 110, 113 (1st Cir. 2011). The statute could be constitutionally applied, the court reasoned, to a defendant who had "no prior convictions for any violent felony." *Id.* Other courts likewise recognize the government's authority to disqualify all felons, even persons convicted of nonviolent felonies, from firearms possession. *See, e.g.*, *United States v. Pruess*, 703 F.3d 242, 247 (4th Cir. 2012); *Skoien*, 614 F.3d at 640; *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010); *United States v. Rozier*, 598 F.3d 768, 769 & n.1 (11th Cir. 2010); *United States v. Vongxay*, 594 F.3d 1111, 1113–14 (9th Cir. 2010).

The First Circuit has similarly upheld laws that categorically disqualify persons convicted of misdemeanors from firearms possession. For example, in *Booker*, the court rejected a Second Amendment challenge to 18 U.S.C. § 922(g)(9), which permanently disqualifies domestic violence misdemeanants from possessing firearms. 644 F.3d at 22–26; *accord United States v. Chovan*, 735 F.3d 1127, 1140–41 (9th Cir. 2013); *Skoien*, 614 F.3d at 639–45; *United States v. White*, 593 F.3d 1199, 1205–06 (11th Cir. 2010). And in two subsequent cases, the First Circuit rejected the claim that § 922(g)(9) is unconstitutional as applied when the underlying misdemeanor assertedly involved *nonviolent* conduct. *See United States v. Carter*, 752 F.3d 8, 12 (1st Cir. 2014) (rejecting the argument that "§ 922(g)(9) 'deprives a significant population of non-violent offenders from exercising a core constitutional right' protected by the Second Amendment"); *United States v. Armstrong*, 706 F.3d 1, 7–8 (1st Cir. 2013), *vacated and remanded on other grounds*, 134 S. Ct. 1759 (2014) (rejecting the argument that "if the relevant misdemeanor conviction is not based on violent behavior, the statute cannot survive intermediate scrutiny as applied").

Taken together, these cases establish that a lifetime disqualification from firearms possession based on a nonviolent felony conviction is compatible with the Second Amendment, as is a lifetime disqualification from firearms possession based on certain misdemeanor convictions, even those that assertedly involved nonviolent conduct.

## II.  Even if This Court Assumes That Sections 131(d)(ii)(D) and 131A Implicate the Second Amendment, the Statutes Easily Withstand Constitutional Scrutiny.

Since *Heller*, the First Circuit, like other courts of appeals, has adopted a two-step framework for assessing Second Amendment claims. *See Worman v. Healey*, 922 F.3d 26, 33 (1st Cir. 2019); *Gould*, 907 F.3d at 668–69. Under this framework, a court must "first ask whether the challenged law burdens conduct that is protected by the Second Amendment," and if it does, the court "then must determine what level of scrutiny is appropriate and must proceed to decide whether the challenged law survives that level of scrutiny." *Worman*, 922 F.3d at 33.

In applying this framework, the First Circuit often assumes, without deciding, that the challenged restriction burdens constitutionally protected conduct and should, therefore, be tested under some level of constitutional scrutiny. *See, e.g.*, *id.* at 36 (assuming that a law banning assault weapons burdens the Second Amendment and upholding that law under intermediate scrutiny). The First Circuit has, in particular, taken this approach when reviewing laws that set requirements or restrictions for firearms licenses. *See Gould*, 907 F.3d at 670 (assuming that firearms licensing regulation burdens the Second Amendment and upholding that law under intermediate scrutiny); *Hightower*, 693 F.3d at 74–75 (assuming that the denial of a license to carry implicates the Second Amendment and upholding that denial under any level of scrutiny); *Booker*, 644 F.3d at 25–26 (upholding the domestic violence misdemeanant disqualification under intermediate scrutiny). In this case, this Court should adopt the same approach and assume, without deciding, that Sections 131(d)(ii)(D) and 131A implicate Second Amendment

rights. It should then review those laws under, at most, intermediate scrutiny and uphold them under that standard of review.

### A.      This Court Should Review Sections 131(d)(ii)(D) and 131A Under, At Most, Intermediate Scrutiny.

Even assuming that Sections 131(d)(ii)(D) and 131A implicate the Second Amendment, and therefore warrant heightened scrutiny, the statutes easily pass constitutional muster. In *Gould*, the First Circuit held that "laws that burden the periphery of the Second Amendment right but not its core" are subject to "intermediate scrutiny," not strict scrutiny. 907 F.3d at 672. The court further held that the "core" right of the Second Amendment is "'the right of *law-abiding*, *responsible* citizens to use arms in defense of hearth and home.'" *Id.* (quoting *Heller*, 554 U.S. at 635) (emphasis added). Laws and regulations that affect other aspects of firearms possession, such as the prohibition of persons with criminal convictions from firearms possession, are "distinct from this core interest emphasized in *Heller*." *Hightower*, 693 F.3d at 72.

Sections 131(d)(ii)(D) and 131A, as applied here, fall well outside the core of the Second Amendment because they disqualify Morin from firearms possession only because he was convicted of weapons-related criminal offenses. By definition, he and similarly situated persons are not law-abiding, as they have been convicted of a crime, whether a felony or a misdemeanor. *See* G.L. c. 140, § 131(d)(ii)(D). And, by definition, these persons have demonstrated that they are not responsible to handle firearms, as they have failed to comply with criminal laws regulating the possession, transfer, or transportation of firearms. *Id.*; *see Schrader v. Holder*, 704 F.3d 980, 989 (D.C. Cir. 2013) ("common-law misdemeanants as a class cannot be considered law-abiding and responsible"). Moreover, to be disqualifying, the violations must be punishable by a "term of imprisonment"; they therefore exclude the least serious weapons-related offenses. G.L. c. 140, § 131(d)(ii)(D). Thus, like the disqualification in *Booker*, Sections 131(d)(ii)(D) and

131A do not burden the core Second Amendment right of law-abiding, responsible citizens to possess a firearm in the home. *See* 644 F.3d at 25 n. 17 (questioning whether the misdemeanant appellants, "who manifestly [we]re not 'law-abiding, responsible citizens,' fall within th[e] zone of interest" identified in *Heller*). Their application to Morin should therefore be reviewed under, at most, intermediate scrutiny. *See Schrader*, 704 F.3d at 989 (upholding common law misdemeanant disqualification under intermediate scrutiny); *Booker*, 644 F.3d at 25–26 (upholding domestic violence misdemeanant disqualification under intermediate scrutiny).

**B.    Sections 131(d)(ii)(D) and 131A Must Be Upheld Under Intermediate Scrutiny Because Disqualifying Persons Convicted of Firearms Offenses Is Substantially Related to the Commonwealth's Important Interests in Promoting Public Safety and Preventing Crime.**

In applying intermediate scrutiny, a court must ask whether the challenged enactment is "substantially related to an important governmental objective." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). The test requires "substantial deference to the predictive judgments" of the Legislature, and the fit between the enactment and the government's interest need not be "perfect." *Gould*, 907 F.3d at 673–74. The government can justify the fit between the statute and government interest "by reference to studies and anecdotes…or even…based solely on history, consensus, and simple common sense." *Florida Bar v. Went for It, Inc.*, 515 U.S. 618, 628 (1995) (internal quotation marks and citations omitted).

Morin's disqualification from firearms possession under Section 131(d)(ii)(D) and 131A easily withstands intermediate scrutiny. The Commonwealth's interests in enacting Section 131(d) were to prevent crime and promote public safety by "limit[ing] access to deadly weapons by irresponsible persons." *Holden*, 26 N.E.3d at 723. Morin does not dispute that those interests are "of the utmost importance." *Dupont v. Chief of Police of Pepperell*, 786 N.E.2d 396, 399 (Mass. App. Ct. 2003); *see also Gould*, 907 F.3d at 673 ("Massachusetts has compelling

13

governmental interests in both public safety and crime prevention.").

As applied, Sections 131(d)(ii)(D) and 131A are substantially related to these interests. First, the nature of the disqualification in Section 131(d)(ii)(D) demonstrates that it aims to prevent crime and promote public safety. Section 131(d)(ii)(D) disqualifies only those persons who have been convicted of a weapons- or ammunition-related offense, and even then only those convicted of an offense "for which a term of imprisonment may be imposed." G.L. c. 140, § 131(d)(ii)(D). In contrast, Massachusetts and other states impose only a fine or forfeiture for lower-level weapons- or ammunition-related criminal offenses and civil infractions. *See, e.g.*, G.L. c. 140, § 131C(a), (b) (individuals with licenses to carry who fail to comply with rules for transporting firearms are subject to a fine); *see also* Conn. Gen. Stat. § 53–202g; Ky. Rev. Stat. § 244.125; Mich. Code § 28.425f; Minn. Stat. § 624.7162; N.C. Gen. Stat. § 14–415.21; Wash. Rev. Code § 9.41.050. In specifying that a disqualifying conviction must be punishable by a term in prison, Section 131(d)(ii)(D) ensures that only criminals with more serious weapons- and ammunition-related convictions are restricted from firearms possession in Massachusetts. Such persons are not "law-abiding, responsible citizens," *Heller*, 554 U.S. at 635, and the Commonwealth reasonably concluded that such persons are at risk for future criminal conduct.

Second, empirical evidence demonstrates that the class of persons regulated by Section 131(d)(ii)(D) and 131A—as applied here, misdemeanants with weapons-related convictions based on nonviolent conduct—is more likely to commit crime and pose a risk to public safety than are persons without prior convictions. In one key study, researchers found that "handgun purchasers with prior misdemeanor convictions had substantially higher rates of criminal activity after handgun purchase than did purchasers with no prior criminal history." Deft's Ex. H (G. Wintemute et al., *Prior Misdemeanor Convictions as a Risk Factor for Later Violent and*

*Firearm-Related Criminal Activity Among Authorized Purchasers of Handguns*, 280 J. AM. MED. ASS'N 2083, 2086 (1998)). Specifically, individuals like Morin with one prior misdemeanor conviction for nonviolent conduct involving firearms were 6.4 times more likely than persons without prior convictions to commit future criminal offenses. *Id.* Those same persons were 7.7 times more likely to commit another nonviolent firearms-related offense and 4.4 times more likely to commit a violent offense in the future. *Id.* ("[H]andgun purchasers who had prior convictions for nonviolent firearm-related offenses such as carrying concealed firearms in public, but none for violent offenses, were at increased risk for later violent offenses."). The study concluded that "handgun purchasers with prior convictions for misdemeanor offenses, regardless of the nature of those offenses," are at "high risk" for future criminal activity. *Id.* at 2087.

Other research has produced similar findings. One recent study concluded that persons with a prior misdemeanor conviction were about four times more likely than persons without a conviction to commit future crimes that would disqualify them from firearms possession under state and federal law. *See* Deft's Ex. I (M. Wright et al., *Felonious or Violent Criminal Activity That Prohibits Gun Ownership Among Prior Purchasers of Handguns: Incidence and Risk Factors*, 69 J. TRAUMA 948, Table 2 (2010)). A separate study demonstrated that approximately 20% of nonviolent offenders released from prison are rearrested for a violent offense within three years of release and 28% are rearrested for a public-order offense. *See* Deft's Ex. J (Bureau of Justice Statistics, U.S. Dep't of Justice, Fact Sheet: *Profile of Nonviolent Offenders Exiting State Prisons*, at 4 & tbl. 11 (Oct. 2004)). Other studies show that persons with firearms-related convictions are at a heightened risk of recidivism. For example, the Department of Justice found that 79.5% of prisoners convicted of weapons-related offenses are rearrested within five years of their release. *See* Deft's Ex. K (Bureau of Justice Statistics, U.S. Dep't of Justice, *Recidivism of*

*Prisoners Released in 30 States in 2005: Patterns from 2005 to 2010*, at 8 tbl. 8 (Apr. 2014)).

This body of research demonstrates a substantial fit between the Commonwealth's goals of preventing crime and promoting public safety, on the one hand, and Section 131(d)(ii)(D)'s disqualification of persons with weapons-related misdemeanor convictions that authorize a term of imprisonment, on the other. Morin protests that the Commonwealth should not be able to disqualify nonviolent misdemeanants from possession of firearms, *see* Pltf's Br. at 8, but the First Circuit has twice rejected that same Second Amendment claim. *See Carter*, 752 F.3d at 12; *Armstrong*, 706 F.3d at 7–8. And in any event, the research demonstrates that nonviolent misdemeanants, and especially nonviolent misdemeanants with firearms-related convictions, are significantly more likely to engage in crime and pose a risk to public safety in the future. *See supra*, at 15–16. Sections 131(d)(ii)(D) and 131A are therefore constitutional as applied to persons like Morin who have been convicted of nonviolent weapons-related misdemeanors.

### III. Morin's Personal Circumstances Are Irrelevant to His Second Amendment Claim, But Even If This Court Considers Them, His Claim is Foreclosed by *Hightower.*

Rather than make any argument to contest the fit between Sections 131(d)(ii)(D) and 131A and the Commonwealth's goals of promoting public safety and preventing crime, Morin urges this Court, in effect, to exempt him from disqualification based on the particular facts of his personal background. *See* Pltf's Br. at 7. He contends that Section 131(d)(ii)(D) cannot constitutionally be applied to him because he "honestly believed what he was doing was perfectly legal"; the crimes for which he was convicted lacked a *mens rea*[7]; he "has no other

---

[7] Morin is incorrect that the crimes he committed—attempted CPWL and possession of an unregistered firearm—are strict liability crimes that lack a *mens rea*. *See* Pltf's Br. at 8. While those crimes are general intent crimes rather than specific intent crimes, they are not strict liability crimes. *See Bsharah v. United States*, 646 A.2d 993, 999–1000 (D.C. 1994) (possession of an unregistered firearm is a general intent crime); *McMillen v. United States*, 407 A.2d 603, 604–05 (D.C. 1979) (CPWL is a general intent crime); *see also Commonwealth v. Lopez*, 745

disqualifying criminal convictions"; and he "has lived a successful and productive life and contributed to society." Pltf's Br. at 7–8.

Morin's argument is inconsistent with First Circuit precedent and with this Court's prior decision in his first lawsuit. Although in 2011 the First Circuit left open the possibility that personal circumstances might bear on an as-applied Second Amendment claim, it noted that "such an approach, applied to countless variations in individual circumstances, would obviously present serious problems of administration, consistency, and fair warning." *Torres-Rosario*, 658 F.3 at 113. One year later, however, in *Hightower*, the court declined to consider personal circumstances in reviewing an as-applied Second Amendment challenge to G.L. c. 140, § 131(d). *See* 693 F.3d at 71–76. The plaintiff, Stacey Hightower, urged the First Circuit to consider her background in evaluating her claim that revoking her license to carry violated the Second Amendment. *See* Reply Br. of Appellant at 32, 35, *Hightower v. City of Boston*, No. 11–2281, 2012 WL 1572549 (1st Cir. May 1, 2012). The First Circuit refused, confining its analysis to the question whether revoking the license to carry of persons in Hightower's class—persons who fill out firearms licensing forms inaccurately—violates the Second Amendment. *See Hightower*, 693 F.3d at 71–76. Hightower's record of military and police service did not factor in the court's analysis or in its rejection of her as-applied Second Amendment claim. *See id.* That approach is consistent with the First Circuit's prior ruling that "the Second Amendment permits categorical regulation of gun possession by classes of persons…rather than requiring that restrictions on the right be imposed only on an individualized, case-by-case basis." *Booker*, 644 F.3d at 23.

Similarly, in granting judgment to the Commonwealth in Morin's first case, this Court ruled that it would not "consider Morin's personal circumstances in deciding whether section

N.E.2d 961, 966 (Mass. 2001) (explaining the difference between general intent crimes, which require the government to prove *mens rea*, and strict liability crimes, which do not).

131(d)(ii)(D) is unconstitutional as applied to him." *Morin*, 189 F. Supp. 3d at 236. "It would be unreasonable to expect the courts to make individualized considerations for every person who is statutorily precluded from obtaining a firearms license but who nevertheless believes that he or she should be entitled to carry a weapon," this Court explained. *Id.* Thus, "[w]hat is relevant in [an] as-applied challenge is the class of persons affected, not the particular circumstances of each individual's situation." *Id.*

Consistent with *Hightower*, *Booker*, and the prior *Morin* decision, this Court should again confirm that, where it is undisputed that Morin was convicted of disqualifying offenses, his personal circumstances are irrelevant to his Second Amendment claim. But to the extent this Court nevertheless considers those personal circumstances, they undercut, rather than support, his claim because they demonstrate that he has been unwilling to comply with laws that promote firearms safety and preserve the integrity of the firearms licensing process. First, in 2004, Morin drove from Massachusetts to Washington, D.C. with a loaded pistol, even though he was not licensed to carry a firearm in any state he drove through except Massachusetts. *See* Deft's Ex. A, ¶ 3. Although some of the states he passed through may have recognized his Massachusetts license to carry, other states, including Connecticut, New York, New Jersey, and Maryland, did not. *See* Deft's Ex. L (U.S. Govt. Accountability Office, STATES' LAWS AND REQUIREMENTS FOR CONCEALED CARRY PERMITS VARY ACROSS THE NATION 80–82 (July 2012)). In each of those states, it was illegal in 2004 to carry a handgun without a license to carry or permit issued by that state. *See* Conn. Gen. Stat. § 29–28 (2004) (permits for out-of-state residents); Conn. Gen. Stat. § 29–35 (2004) (criminal prohibition); Md. Code, Crim. § 4–203(a) (2004) (criminal prohibition); Md. Code, Public Safety § 5–303 (2004) (requiring a permit to carry a handgun); N.J. Stat. Ann. § 2C:39–5(b) (2004) (criminal prohibition); N.J. Stat. Ann. § 2C:58–4 (2004)

(process for obtaining a permit); N.Y. Penal Law, § 265.01 (2004) (criminal prohibition); 1997 N.Y. Op. Att'y Gen. 14 (1997) ("New York law does not recognize or give effect to licenses to carry firearms issued by the State of Georgia or any other state."). Morin therefore violated several states' firearms laws in 2004, in addition to the laws he violated in Washington, D.C.

Second, once he was in Washington, Morin approached a federal government building with a loaded pistol. *See* Deft's Ex. D, at 4. It is common knowledge that civilians cannot bring firearms into federal government buildings, whether Smithsonian museums or federal courthouses. *See* 18 U.S.C. §§ 930(a), (e)(1); *Heller v. District of Columbia*, 801 F.3d 264, 283 (D.C. Cir. 2015) (Henderson, J., concurring in part and dissenting in part) ("The record amply documents the unique security risks presented by a city full of high-level government officials, diplomats, monuments, parades, protests and demonstrations and, perhaps most pertinent, countless government buildings where citizens are almost universally prohibited from possessing firearms."). In approaching a federal government building with a loaded pistol, Morin disregarded the laws protecting the security of federal officials and the public.

Third, four years after his convictions, Morin falsely stated on his 2008 license-to-carry renewal application that he had not been convicted of any law regulating the possession of weapons for which a term of imprisonment could be imposed. *See* Deft's Ex. B, at 2.[8] He made that false representation even though he signed the application under the pains and penalties of perjury. *Id.* at 3. In answering that question, Morin did precisely what Hightower did in the *Hightower* case: he "inaccurately answered a question on her license renewal form." 693 F.3d at

---

[8] In so doing, Morin may have violated G.L. c. 140, § 129, which makes it a criminal offense to "knowingly offe[r] or giv[e] false information concerning…[a] criminal record" in any "application for any form of license or permit issued in connection" with a firearm, and G.L. c. 140, § 131(h), which specifies criminal penalties for "[a]ny person who knowingly files [a license-to-carry] application containing false information."

65. And like Morin, Hightower represented that she was an upstanding citizen with a record of service. *See* Br. of Appellant at 12, *Hightower v. City of Boston*, No. 11–2281, 2012 WL 435288 (1st Cir. Feb. 7, 2012). Nevertheless, the First Circuit held that revoking her license to carry based on the inaccurate answer in her application was consistent with the Second Amendment. *Hightower*, 693 F.3d at 74–75. The requirement that firearms license applicants provide truthful information, the court explained, "helps ensure the integrity of the system of keeping prohibited persons from possessing firearms." *Id.* It also promotes public safety: data from the Bureau of Alcohol, Tobacco, and Firearms shows that individuals who make false statements on gun forms are "far more likely to go on to commit a gun crime than even many experts recognize." Deft's Ex. M (J. Pagliery, *Gun Form Liars May Go on to Commit Gun Crimes, Internal ATF Research Suggests*, CNN Investigates, at 2 (Dec. 21, 2018) (10-21% of this group are later arrested for a crime involving guns)).  If it did not violate the Second Amendment to revoke Hightower's license to carry based on the submission of false information, it cannot violate the Second Amendment to withhold a license to carry from Morin, who engaged in the same conduct.

Finally, there are no facts in the record tending to show that Morin is a law-abiding, responsible citizen, or that Morin poses no risk to public safety. Morin's brief in support of his motion for summary judgment makes several claims about his personal characteristics and background, *see* Pltf's Br. at 7, but these statements must be disregarded because they are not supported by competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A) (requiring the moving party to support factual assertions with "depositions, documents, electronically stored information, affidavits or declarations, stipulations…, admissions, interrogatory answers, or other materials").

For all of these reasons, Sections 131(d)(ii)(D) and 131A are constitutional as applied to Morin, and the Commonwealth is entitled to judgment on his Second Amendment claim.

## CONCLUSION

This Court should deny Morin's motion for summary judgment, grant the Commonwealth's cross-motion for summary judgment, and enter judgment in favor of the Commonwealth.

Respectfully submitted,

THE COMMONWEALTH OF
MASSACHUSETTS,

By its attorney,

MAURA HEALEY
ATTORNEY GENERAL


  /s/ Julia Kobick_____
Julia Kobick, BBO #680194
Assistant Attorney General
Office of the Attorney General
Government Bureau
One Ashburton Place, 20th Floor
Boston, Massachusetts 02108
Date: June 12, 2019          (617) 963-2559


## CERTIFICATE OF SERVICE

I certify that this document filed through the CM/ECF system will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 12, 2019.

/s/ Julia Kobick_____
Julia Kobick
Assistant Attorney General

21