UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ALFRED MORIN,<br>          Plaintiff,<br><br>v.<br><br>WILLIAM LYVER, in his official capacity<br>as Northborough Chief of Police,<br>          Defendant,<br><br>COMMONWEALTH OF<br>MASSACHUSETTS,<br>          Intervenor-Defendant. | CIVIL ACTION<br>NO. 4:18-40121-TSH |

**MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, THE COMMONWEALTH'S CROSS-MOTION FOR SUMMARY JUDGMENT, AND CHIEF LYVER'S CROSS-MOTION FOR SUMMARY JUDGMENT (Docket Nos. 19, 25, and 29)**

**March 4, 2020**

**HILLMAN, D.J.**

Alfred Morin ("Plaintiff") filed the instant action against William Lyver ("Chief Lyver") in his official capacity as Chief of Police of the Town of Northborough, alleging that the Massachusetts firearms licensing scheme, which renders him ineligible for a license to carry, or a permit to purchase, a firearm, violates his Second Amendment right to possess a firearm in his home for self-defense. The Commonwealth of Massachusetts has intervened as a Defendant, and all parties move for summary judgment. For the reasons set forth below, I find the statute constitutional and ***deny*** Plaintiff's motion for summary judgment (Docket No. 19), ***grant*** the Commonwealth's cross-motion for summary judgment (Docket No. 25), and ***grant*** Chief Lyver's cross-motion for summary judgment (Docket No. 29).

1

## Background

The Commonwealth issued Plaintiff a Class A license to carry firearms in 1985. His Class A license allowed him to carry a concealed firearm in public, and he had a habit of always carrying a loaded pistol on his person. In October 2004, Plaintiff drove from Massachusetts to Washington, DC, to visit his daughter. Unaware that the District of Columbia would not recognize his Massachusetts license, he carried his pistol with him. While visiting the American Museum of Natural History during his trip, Plaintiff noticed a sign banning firearms. He approached a guard at the museum and asked to check his weapon. The guard contacted the police, who arrested Plaintiff and charged him with carrying a pistol without a license, possession of an unregistered firearm, and unlawful possession of ammunition. Plaintiff pled guilty to attempting to carry a pistol without a license, in violation of D.C. Code § 22-3204(a)(1) (2004),[1] and possession of an unregistered firearm, in violation of D.C. Code § 6-2376 (2004).[2] (Docket No. 21-3). The court sentenced him to sixty days in prison on each count, to run concurrently, as well as three months of supervised probation and twenty hours of community service. His prison sentence was suspended.

Plaintiff's Class A license expired in 2008, and he applied for a renewal. The renewal form asked whether he had, "in any state or federal jurisdiction," been convicted of a "violation of any law regulating the use, possession, ownership, sale, transfer, rental, receipt or transportation of weapons for which a term of imprisonment may be imposed." (Docket No. 25-3 at 3). Plaintiff answered "no." (Docket No. 25-3 at 3). The Northborough Police Department

---

[1]  This provision has been renumbered and is now codified at D.C. Code § 22-4504(a)(1).
[2]  This provision has been renumbered and is now codified at D.C. Code §§ 7-2502.01, 7-2507.6.

ran a fingerprint check, discovered his convictions, and denied his license in accordance with Mass. Gen. Laws ch. 140, § 131(d)(ii)(D). (Docket No. 25-7 at 2).

Seven years later, in February 2015, Plaintiff reapplied for a license to carry. This time, when asked about previous firearms-related convictions, he answered "yes." (Docket No. 25-5 at 3). Because his convictions rendered him ineligible for a license to carry, then-Chief of Police Mark Leahy denied Plaintiff's application. (Docket No. 25-8 at 2). Plaintiff filed suit in this Court to challenge the constitutionality of the Massachusetts firearms licensing scheme. The Commonwealth intervened, and the parties cross-moved for summary judgment. I entered summary judgment against Plaintiff, reasoning that, because Plaintiff had applied only for the least restrictive firearms license in Massachusetts, it was unnecessary to decide "whether a complete categorical prohibition on the arms rights of individuals who have been convicted of certain weapons-related misdemeanors is constitutional, because that is not what is being challenged in this case." *Morin v. Leahy*, 189 F. Supp. 3d 226, 234 (D. Mass. 2016), *aff'd*, 862 F.3d 123 (1st Cir. 2017). The First Circuit affirmed on appeal. *Morin v. Leahy*, 862 F.3d 123, 127 (1st Cir. 2017).

In February 2018, Plaintiff applied for a firearm identification ("FID") card and a permit to purchase a firearm under Mass. Gen. Laws ch. 140, §§ 129B, 131A. (Docket No. 30-1). Chief Lyver issued Plaintiff an FID card but denied his application for a permit to purchase, noting that Plaintiff's convictions in DC rendered him ineligible for a permit to purchase a firearm under Section 131A. (Docket No. 22-2). Plaintiff filed suit in this Court, raising an as-applied Second Amendment challenge to the licensing scheme. The Commonwealth intervened as a Defendant, and the parties filed cross-motions for summary judgment.

## Statutory Framework

Massachusetts regulates the possession of firearms within its borders, and "[i]t is generally a crime under Massachusetts law to carry a firearm without having the appropriate license or FID card, or being exempt from licensing." *Hightower v. City of Bos.*, 693 F.3d 61, 65 (1st Cir. 2012) (citing Mass. Gen. Laws ch. 269, § 10). An individual wishing to possess and/or carry firearms in an open or concealed manner in his home or in public may apply for a license to carry[3] through the "licensing authority," Mass. Gen. Laws ch. 140, § 131, defined as "the chief of police or the board or officer having control of the police in a city or town, or persons authorized by them," *see id.* § 121. The licensing authority "may issue [a license] if it appears that the applicant is not a prohibited person . . . and that the applicant has good reason to fear injury to the applicant or the applicant's property or for any other reason, including the carrying of firearms for use in sport or target practice only." *Id.* § 131(d). An applicant is a "prohibited person" if, as relevant here, he has been convicted in any state or federal jurisdiction of "a violation of any law regulating the use, possession, ownership, transfer, purchase, sale, lease, rental, receipt or transportation of weapons or ammunition for which a term of imprisonment may be imposed." *Id.* §§ 131(d)(i)(D), (d)(ii)(D).

The licensing authority also reviews applications for FID cards. The holder of an FID card may "own, transfer, or possess a firearm in his residence or place of business." *Commonwealth v. Gouse*, 965 N.E.2d 774, 799 n.14 (Mass. 2012); *see also Powell v. Tompkins*, 783 F.3d 332, 337 (1st Cir. 2015). However, "a[n] FID Card alone is insufficient to purchase and transport a firearm to one's home." *Morin*, 862 F.3d at 127. An individual with an FID must separately apply for a

---

[3] Massachusetts law currently designates certain licenses to carry as "Class A" or "Class B." In 2014, however, the Legislature enacted a law effective January 1, 2021, to combine the two into a single license to carry, and licenses issued or renewed after August 11, 2014, have not been designated as "Class A" or "Class B." *See* 2014 Mass. Acts ch. 284, § 101.

4

permit to "purchase, rent or lease a firearm for a proper purpose." Mass. Gen. Laws ch. 140, § 131A. To obtain a permit to purchase, an applicant must possess the same qualifications for obtaining a license to carry under Section 131. *Id.*

## Legal Standard

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." An issue is "genuine" when a reasonable factfinder could resolve it in favor of the nonmoving party. *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994). A fact is "material" when it may affect the outcome of the suit. *Id.* When ruling on a motion for summary judgment, "the court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Scanlon v. Dep't of Army*, 277 F.3d 598, 600 (1st Cir. 2002) (citation omitted).

## Discussion

### 1. Legal Framework

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In the landmark decision of *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment provides an individual right to bear arms.[4] *Id.* at 576–626. The Court based its holding on the "operative clause" of the Second Amendment i.e., the portion stating that "the right of the people to keep and bear Arms, shall not be infringed." *Id.* at 577, 592. The Court interpreted this clause to "guarantee the individual right to possess and carry weapons in

---

[4] And in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Court held that the Second Amendment extends to state regulation of firearms through the Fourteenth Amendment. *Id.* at 750.

case of confrontation." *Id.* at 592. The Court held that, although "self-defense had little to do with the right's *codification*; it was the *central component* of the right itself." *Id.* at 599 (emphasis in original). The Court explained that, at its core, the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635; *see also Gould v. Morgan*, 907 F.3d 659, 672 (1st Cir. 2018); *Hightower*, 693 F.3d at 72; *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010). The Court noted, however, that "the right secured by the Second Amendment is not unlimited" and cautioned that nothing in its opinion "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626–27.

"In the decade since *Heller* was decided, courts have adopted a two-step approach for analyzing claims that a statute, ordinance, or regulation infringes the Second Amendment right." *Gould*, 907 F.3d at 668. First, a court "asks whether the challenged law burdens conduct that falls within the scope of the Second Amendment's guarantee." *Id.* at 668–69. "This is a backward-looking inquiry, which seeks to determine whether the regulated conduct 'was understood to be within the scope of the right at the time of ratification.'" *Id.* at 669 (quoting *Chester*, 628 F.3d at 680). Second, "[i]f that step is successfully negotiated so we can say that the challenged law 'burdens conduct falling within the scope of the Second Amendment," then the court "'must determine what level of scrutiny is appropriate and must proceed to decide whether the challenged law survives that level of scrutiny.'" *Worman v. Healey*, 922 F.3d 26, 33 (1st Cir. 2019) (quoting *Gould*, 907 F.3d at 669).

6

*2. Analysis*

In this case, Plaintiff has received an FID card and can lawfully possess a firearm within his home. Chief Lyver, however, denied his application for a license to carry or a permit to purchase a firearm. Plaintiff argues that Sections 131 and 131A, the provisions under which Chief Lyver denied his application, burden his Second Amendment right because they prevent him from lawfully *obtaining* any firearm to possess within his home. (Docket No. 19 at 9). I assume, without deciding, that Plaintiff is correct that these provisions burden conduct falling within the scope of the Second Amendment right. *See Worman*, 922 F.3d at 36 ("For present purposes, we simply assume, albeit without deciding, that the Act burdens conduct that falls somewhere within the compass of the Second Amendment."). I therefore focus on the second step of the framework, i.e., "what level of scrutiny is appropriate" and "whether the challenged law survives that level of scrutiny." *Id.* at 33 (quoting *Gould*, 907 F.3d at 669).

A. *Level of Scrutiny*

The level of scrutiny a court should apply "turn[s] on how closely a particular law or policy approaches the core of the Second Amendment right and how heavily it burdens that right." *Gould*, 907 F.3d at 670–71. "A law or policy that burdens conduct falling within the core of the Second Amendment requires a correspondingly strict level of scrutiny, whereas a law or policy that burdens conduct falling outside the core of the Second Amendment logically requires a less demanding level of scrutiny." *Id.* at 671.

Plaintiff contends that something more rigorous than intermediate scrutiny is appropriate here because the Massachusetts licensing scheme burdens the core right guaranteed by the Second Amendment. (Docket No. 19 at 11). I disagree. At its core, the Second Amendment protects "the right of *law-abiding, responsible* citizens to use arms in defense of hearth and home." *Heller*, 554

U.S. at 635 (emphasis added); *see also Gould*, 907 F.3d at 672.  Individuals convicted of weapons-related offenses punishable by a term of imprisonment are not the type of law-abiding, responsible citizens contemplated by the Court in *Heller*.

Plaintiff suggests I should consider him, in particular, as law-abiding because he has "never committed a crime of violence," "honestly believed what he was doing was perfectly legal," and "has lived a successful and productive life and contributed to society." (Docket No. 19 at 11).  He cites to the D.C. Circuit's decision in *Schrader v. Holder*, 704 F.3d 980 (D.C. Cir. 2013), for the proposition that a court may consider an individual law-abiding despite a prior conviction.  But the passage Plaintiff quotes is dicta.  In it, the D.C. Circuit notes that, *if Schrader had raised an as-applied challenge on an individual basis*, it "would hesitate to find [him]," an individual whose only offense involved a fistfight forty years earlier, "outside the class of 'law-abiding, responsible citizens' whose possession of firearms is, under *Heller*, protected by the Second Amendment." *Id.* at 991.  On a class-wide basis, however, the D.C. Circuit held that "common-law misdemeanants . . . cannot be considered law-abiding and responsible." *Id.* at 293.  And here, I decline to consider Plaintiff's as-applied challenge on an individual basis.  As I noted in disposing of Plaintiff's previous case, "[i]t would be unreasonable to expect the courts to make individualized considerations for every person who is statutorily precluded from obtaining a firearms license but who nevertheless believes that he or she should be entitled to carry a weapon." *Morin*, 189 F. Supp. 3d at 236; *see also United States v. Booker*, 644 F.3d 12, 23 (1st Cir. 2011) (noting that "the Second Amendment permits categorical regulation of gun possession by classes of persons . . . rather than requiring that restrictions on the right be imposed only on an individualized, case-by-case basis").  The proper means by which to assess an as-applied challenge is to look at "the class

of persons affected, not the particular circumstances of each individual's situation." *Morin*, 189 F. Supp. 3d at 236.

In sum, because individuals convicted of weapons-related offenses punishable by a term of imprisonment are not, as a class, law-abiding and responsible citizens, Sections 131 and 131A do not implicate the core of the right protected by the Second Amendment. And because the First Circuit has indicated that "intermediate scrutiny is appropriate as long as a challenged regulation . . . fails to implicate the core Second Amendment right," I find intermediate scrutiny to be the correct level of scrutiny to assess the constitutionality of these provisions. *See Worman*, 922 F.3d at 38; *see also Booker*, 644 F.3d at 25 n.17 ("We would question whether appellants, who manifestly are not 'law-abiding, responsible citizens,' fall within this zone of interest [protected by the Second Amendment]."); *id.* at 25 ("We think it sufficient to conclude, as did the Seventh Circuit, that a categorical ban on gun ownership by a class of individuals must be supported by some form of 'strong showing,' necessitating a substantial relationship between the restriction and an important governmental objective." (quoting *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc))).

## B. Constitutionality

"To survive intermediate scrutiny, a statute must be substantially related to an important governmental objective." *Worman*, 922 F.3d at 38 (citations and internal quotation marks omitted). A statute is substantially related to an important governmental objective if there is a "'reasonable fit' between the restrictions imposed by the law and the government's valid objectives, 'such that the law does not burden more conduct than is reasonably necessary.'" *Id.* (quoting *Gould*, 907 F.3d at 674).

The Massachusetts firearms licensing scheme prevents individuals previously convicted of any weapons-related offense punishable by a term of prison from obtaining a license to carry or permit to purchase a firearm. The goal of this scheme is to improve public safety and prevent crime by limiting the access of irresponsible individuals to deadly weapons. *Chief of Police of City of Worcester v. Holden*, 470 Mass. 845, 853 (2015) ("The purpose of G.L. c. 140, § 131, is to 'limit access to deadly weapons by irresponsible persons.'" (quoting *Ruggiero v. Police Comm'r of Bos.*, 18 Mass. App. Ct. 256, 258 (1984))). Massachusetts' interests in preventing crime and promoting public safety are undoubtedly important, *see Gould*, 922 F.3d at 39, so what remains is to determine whether a categorical ban reasonably serves these interests.

The answer is yes. Ample empirical evidence suggests that those who have been convicted of weapons-related offenses—even nonviolent offenses—are more likely to commit a crime or threaten public safety than those who have not. *See, e.g.*, Garen J. Wintemute et al., *Prior Misdemeanor Convictions as a Risk Factor for Later Violent and Firearm-Related Criminal Activity Among Authorized Purchasers of Handguns*, 280 J. AM. MED. ASS'N 2083, 2086 (1998) ("[H]andgun purchasers who had prior convictions for nonviolent firearm-related offenses such as carrying concealed firearms in public, but none for violent offenses, were at increased risk for later violent offenses."); *id.* at 2087 ("[T]here now is evidence that denial of handgun purchase reduces the incidence of subsequent criminal activity among [persons convicted of misdemeanor crimes]."); Mona A. Wright & Garen J. Wintemute, *Felonious or Violent Criminal Activity that Prohibits Gun Ownership Among Prior Purchasers of Handguns: Incidence and Risk Factors*, 69 J. TRAUMA 948 tbl. 2 (2010) (finding that persons convicted of misdemeanor offenses are five times more likely to commit future crimes that would disqualify them from possessing firearms under federal and state law than persons without such convictions). Section 131 and 131A,

moreover, do not prevent *all* individuals convicted of weapons-related offenses from purchasing firearms but instead focus on individuals convicted of offenses for which a term of imprisonment may be imposed. Studies document high recidivism rates among individuals serving a prison term for a weapons-conviction. *See, e.g.*, Bureau of Justice Statistics, U.S. Dep't of Justice, *Recidivism of Prisoners Released in 30 States in 2005: Patterns from 2005 to 2010*, at 8 tbl. 8 (Apr. 2014) (finding a 79.5% recidivism rate after 5 years among those arrested for weapons-related offenses); Bureau of Justice Statistics, U.S. Dep't of Justice, *Fact Sheet: Profile of Nonviolent Offenders Exiting State Prisons*, at 2 (Oct. 2004) ("Within 3 years of their release from prison, about 7 in 10 nonviolent releasees were rearrested for a new crime; nearly half were reconvicted; and more than a quarter were returned to prison . . . ."). By excluding individuals convicted of lower-level offenses punishable only by fine or forfeiture—i.e., those least likely to pose a danger to society—from their sweep, Sections 131 and 131A avoid burdening more conduct than reasonably necessary.

In sum, because Sections 131 and 131A substantially relate to Massachusetts' interest in preventing crime and promoting public safety and are reasonably tailored to meet these needs, the provisions pass constitutional muster. I accordingly ***deny*** Plaintiff's motion for summary judgment (Docket No. 19) and ***grant*** the Commonwealth's motion (Docket No. 25).

### 3. *Chief Lyver*

In his motion for summary judgment, Chief Lyver incorporates the Commonwealth's constitutionality arguments. (Docket No. 29 at 3). I therefore ***grant*** his motion for summary judgment for the reasons discussed above.[5]

---

[5] Because I find the statute constitutional, I decline to address the other arguments in favor of summary judgment advanced by Chief Lyver.

## **Conclusion**

For the reasons stated above, I **_deny_** Plaintiff's motion for summary judgment (Docket No. 19), **_grant_** the Commonwealth's cross-motion for summary judgment (Docket No. 25), and **_grant_** Chief Lyver's cross-motion for summary judgment (Docket No. 29).

**SO ORDERED**

                                              **_/s/ Timothy S. Hillman_**
                                              **TIMOTHY S. HILLMAN**
                                              **DISTRICT JUDGE**